Filed 1/23/26  Alexander v. Dept. of Health Services of the County of L.A. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ATHENA ALEXANDER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>DEPARTMENT OF HEALTH SERVICES OF THE COUNTY OF LOS ANGELES,<br><br>    Defendant and Respondent. | B332500<br><br>(Los Angeles County Super. Ct. No. 22STCP03095) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell Beckloff, Judge.  Affirmed.

Fenton Jurkowitz Law Group, Henry R. Fenton, Benjamin J. Fenton, and David D. Wagmeister for Plaintiff and Appellant.

Nossaman, Tom Curtis, and Michael Gawley for Defendant and Respondent.

The Department of Health Services of the County of Los Angeles (the Department) declined to renew medical doctor Athena Alexander's (Alexander's) privileges to practice internal medicine at one of its outpatient clinics because she did not keep timely and accurate medical records. The trial court, in an administrative mandamus action, concluded the Department's action was justified. Alexander now asks us to decide whether sufficient evidence supports the court's determination notwithstanding her contention that the various responsibilities she was assigned made patient record keeping too difficult to complete.

## I. BACKGROUND

### A. *Nonrenewal of Alexander's Privileges*

Alexander is a board-certified specialist in internal medicine. In June 2017, the Department, which runs a system of ambulatory care clinics in Los Angeles County, granted Alexander privileges to practice at its Martin Luther King, Jr. Outpatient Center (MLK). Newly hired physicians at Department clinics are initially granted a six-month provisional privilege; if a physician successfully completes his or her probationary period, they are granted a "full active privilege" which must be renewed every two years.

In her first "physician performance evaluation," which covered the period from June 1, 2017, through December 1, 2017, Alexander met or exceeded expectations on all evaluative criteria. One area in which her performance exceeded expectations was "medical record maintenance." In her second evaluation, which covered the period from August 1, 2017, to July 31, 2018, her

2

reviewer found she met expectations with regard to all performance criteria, including maintenance of medical records.

In the summer of 2018, Alexander took leave from July 16 to August 3 because she felt overwhelmed by work and her medical record-keeping duties. During her absence, "multiple" doctors covering for her reported that files for her patients lacked provider notes. After Alexander returned to work, her supervisor Dr. KhanhPhong Trinh (Trinh) reviewed records for the patients Alexander treated over the course of four days and found that none of the patient files included the provider's note that is entered to document the patients' complaints, symptoms, Alexander's assessment, and the plan of treatment. Trinh subsequently reviewed 10 random sets of patient records from April 1, 2018, to August 10, 2018, and discovered that none of those records contained a provider's note by Alexander either.

In September 2018, Trinh met with Alexander to discuss the deficiencies in her medical record keeping. At that meeting, Alexander admitted she had incomplete patient records extending back to April 2018 and attributed her lack of documentation to her patient workload and her desire to create detailed medical records.

The following month Trinh and MLK's chief medical officer Dr. Ellen Rothman (Rothman) met with Alexander to emphasize she needed to complete patient documentation in a timely manner. As before, Alexander admitted she was behind in her record-keeping and acknowledged the importance of timely and accurate patient records. At this October 2018 meeting, Trinh and Rothman discussed with Alexander strategies to improve her record-keeping. They also provided her with copies of MLK's

policies regarding clinical documentation and advised her that henceforth her performance would be monitored.

Between October 1 and December 31, 2018, Alexander had 375 patient encounters; a review of those patients' files revealed that 234 (or 62.4 percent) lacked a provider's note documenting the encounter.

In an interim performance evaluation covering the time from August 1, 2018, to January 7, 2019, Trinh recorded he was unable to evaluate Alexander's ability to care for her patients due to "missing documentation." Trinh observed that "[m]issing clinical documentation has resulted in challenges for other providers in their ability to provide appropriate clinical care when they have covered for Dr. Alexander, and for other providers who see her patients in other capacities. As a result, there is a real potential for harm and other adverse events for patients."

Between December 26, 2018, and March 17, 2019, Alexander was on medical leave from work. In April 2019, she applied for reappointment. In view of her continuing difficulties with clinical documentation, Rothman requested that a six-month Focused Profession Practice Evaluation (FPPE) be conducted and that Alexander's privileges be extended for only that six-month period.

When Alexander first returned from medical leave in the spring of 2019, Trinh noticed an initial improvement in Alexander's record-keeping; only 37 percent of patient files lacked provider notes in a review of 92 patient encounters during March 18-31, 2019. As more time passed, however, Trinh observed Alexander's record keeping regressed: for the four-month period between March 1, 2019, and June 30, 2019, Alexander had 656

4

face-to-face encounters with patients and 395 of these (or 60.2 percent) were missing provider notes.

Trinh and Rothman met with Alexander in July 2019. She said she understood the importance of completing clinical documentation and she "had a plan to catch up" on the missing paperwork.

A review of Alexander's patient files completed the following month showed that between March 1 and July 31, 2019, Alexander did not complete provider notes in 539 out of 865 patient encounters (62 percent). A review of patient charts for the period from July 29 to September 5, 2019, showed that when Alexander completed her provider notes, the quality of her work was "good"; the notes were "clear and comprehensive [and] they [we]re not too long or too detailed." But of the 186 patient encounters during this period, only 38 provider notes were completed, which meant 148 (or 79.5 percent) of the patient charts lacked provider notes.

The FPPE report subsequently completed by Trinh recounted Alexander's inability, since April 2018, to stay current with her clinical documentation. The report also noted the record keeping issues had persisted even though Alexander's "workload is on par with her peers, perhaps even below average. . . . [S]he averages less than 6 patient encounters per session ([the Ambulatory Care Network] goal is 6.5). She has 2 dedicated sessions per week of administrative time. And she does not have other responsibilities beyond direct patient care. Unlike many other providers, she does not sit on any committees, attend optional education sessions . . . , participate in resident teaching, lead a CIT team, or work on [Quality Improvement] projects." Trinh further observed that Alexander had "not demonstrated

5

any initiative or extra effort. For example, she had not requested any extra overtime, or even extra admin time to catch up. She did not request overtime until her supervisor advised her to do so. While not expected, she has rarely stayed past the end of her shift to complete her work. She was offered an alternative work schedule, including some evening sessions and a later start, to mitigate some challenges in her daily commute, but she declined this as well."

Based on Alexander's continued record-keeping difficulties (as documented in the FPPE report), Trinh and Rothman recommended the Department not renew her privileges to practice at MLK. Before the Department's Credentialing and Privileging Committee (CPC) could consider that recommendation and the FPPE findings, Alexander took leave for more than 18 months, from September 2019 through June 2021.

In April 2021, while on leave, Alexander applied to have her privileges at MLK renewed. Later that same month, the CPC voted unanimously to deny Alexander's application due to her persistent failure to document her encounters with patients in their health records despite being given the opportunity to correct that "deficiency" between August 2018 and August 2019. In its letter notifying Alexander of its decision, the CPC advised she could request a hearing challenging the decision, which she did.

### B. Alexander's Administrative Appeal of the Nonrenewal

In early December 2021, over the course of three days, a panel of three doctors (two internists and one family practitioner) held an evidentiary hearing triggered by Alexander's appeal of the CPC's decision not to renew her privileges. In addition to exhibits, the CPC presented testimony from three witnesses:

Trinh; Rothman; and Dr. Jennifer Chen (Chen), the co-chair of the CPC.

Trinh and Rothman recounted their knowledge of Alexander's problems with medical documentation and their efforts to help remedy the problem. Each also testified that inadequate, incomplete, or untimely clinical documentation created a risk of harm to patients. Chen added that deficiencies in medical record-keeping also made it "impossible" to assess Alexander's competence, decision-making, and the quality of care she delivered.

Alexander, for her part, also submitted documentary evidence and called three third-party witness: Patricia Castillo (Castillo), Alexander's union representative; Dr. Shauntelle Bonman (Bonman); and Dr. Perlita Perez (Perez). Castillo explained that the union's position was that four hours of administrative time per week was insufficient for doctors at MLK to complete their charting responsibilities in view of the number of patients they were expected to see each session. Bonman and Perez each testified that during their tenure at MLK there was insufficient time each day to complete their clinical documentation due to the number of patients and their "complexity." Bonman did concede that the absence of a provider note in a patient's file would create a potential quality of care problem. She also testified that despite the heavy patient workload, and despite participating on committees, she was able to complete all her clinical documentation requirements when she practiced at MLK.

Alexander also testified herself at the administrative appeal evidentiary hearing. She said she saw more than a dozen patients each day at MLK and, over time, her panel of patients

exceeded one thousand. Like Bonman and Perez, Alexander described her patients as requiring time-intensive interactions due to their complicated health histories. She testified that late documentation was a common problem at MLK and she recalled how, early in her tenure at the clinic, Rothman asked her to help a MLK cardiologist complete a backlog of 800 uncompleted provider notes. She conceded, however, that her supervisors' concerns about her lack of documentation were justified because the missing provider notes could jeopardize patient safety and would prevent them from assessing her competence. Alexander also admitted that her supervisors had given her more administrative time than other doctors at MLK.

In mid-December 2021, the hearing panel issued its written decision. The panel ruled unanimously that the CPC's decision to deny Alexander's application for renewal of credentialing and privileges was reasonable and warranted. The panel found that Alexander was a "well-trained physician who performed well during the first 7-8 months of her employment," but she "failed to adapt to her workload and began engaging in an extended period of incompetent record-keeping that put patient safety at risk. She had hundreds of missing and incomplete documents despite having a similar or smaller workload . . . and having more administrative time . . . ." The panel further found that Alexander did not present "any clear plan . . . as to how she would be able to catch up [on] her huge backlog and prevent such backlog from happening in the future, in case another extension of privileges would have been granted."

Later that same month, Alexander asked the Department's Appeal Board to reverse the hearing panel's decision as arbitrary, capricious, and not supported by substantial evidence. In May

2022, following briefing and oral argument, the Appeal Board unanimously "concur[red]" with the decision of the hearing panel, finding it was "supported by the documentary and testimonial evidence." The Appeal Board recommended the Department's Director affirm the hearing panel's decision, which the Director did.

Alexander subsequently petitioned for a writ of mandamus directing the Department to reverse its decision to deny her application for recredentialing and to approve the application. She maintained the Department's decision was arbitrary, capricious, and contrary to the interests of justice.

In a written decision issued in August 2023, the trial court denied Alexander's writ petition. Based on its independent review of the administrative record, the court found that the weight of the evidence supported the findings by the hearing panel that Alexander's "'consistent failure for more than one year to complete her clinical documentation in a timely manner was beyond reason and represented incompetence'; posed a direct threat to patients; and prevented [her] supervisors from assessing [her] competence during peer review audits." The court further found that the weight of the evidence supported the panel's implied finding that "there was no excuse for [Alexander's] 'consistent failure' to complete her clinical documentation in a timely manner."

## II. DISCUSSION

Alexander maintains reversal is required because the trial court "unfairly discounted [or] failed to acknowledge [her] evidence about how [she] lacked sufficient time to prepare patient notes because [the Department] imposed inordinate tasks onto

9

her." Alexander's argument reflects a misapprehension of the applicable standard of review. The issue before us is not whether there was evidence in Alexander's favor from which the trial court could have reached a conclusion different from the one it did. Rather, the issue is whether there is substantial evidence to support the conclusion the court did draw. And there is. It is undisputed that Alexander did not provide critical clinical documentation for hundreds of her patient encounters and the absence of this documentation placed the safety of those patients at risk and prevented her supervisors from evaluating her competence as a doctor. There is also substantial evidence (e.g., the FPPE report and Bonman's testimony) that Alexander had sufficient time to complete the required patient documentation but failed to do so.

### A. Standard of Review

"Regardless of the nature of the right involved or the standard of judicial review applied in the trial court, an appellate court reviewing the superior court's administrative mandamus decision always applies a substantial evidence standard." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058, citing *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 and *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143-144.) "[D]epending on whether the trial court exercised independent judgment or applied the substantial evidence test, the appellate court will review the record to determine whether either the trial court's judgment or the agency's findings, respectively, are supported by substantial evidence." (*JKH Enterprises*, *supra*, 142 Cal.App.4th at 1058; accord, *Lusardi*

*Construction Co. v. Department of Industrial Relations* (2024) 102 Cal.App.5th 1329, 1343-44.)

Here, because the trial court exercised its independent judgment, we review its findings for substantial evidence. "'Substantial evidence must be reasonable in nature, credible, and of solid value such that a reasonable mind might accept it as adequate to support a conclusion.'" (*South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291, 303; accord *Applied Materials v. Workers' Comp. Appeals Bd.* (2021) 64 Cal.App.5th 1042, 1068.)

###### B. *Substantial Evidence Supports the Denial of Writ Relief*

The administrative record shows that after being alerted by other MLK healthcare providers in the summer of 2018 that Alexander's patient records were incomplete, her supervisors investigated the matter, discovered that provider notes were indeed missing, and met with Alexander—who admitted not only that incomplete clinical documentation posed a risk to patient safety, but also that the problem of missing records extended back into the spring of 2018. Although she was reminded of the Department's polices regarding clinical documentation, counseled on how to rectify the problem, and advised that her record-keeping performance would be monitored on a going forward basis, Alexander allowed the scope of the problem to grow over time until hundreds of patient encounters were undocumented. Moreover, the Department's statistical evidence showed that Alexander's problem grew worse, not better, despite monitoring and repeated counseling: from 62.4 percent of patient encounters going undocumented in the fall of 2018, the rate of missing

11

clinical documentation climbed to 79.5 percent in the late summer of 2019.

In her testimony before the hearing panel, Alexander did not contest the Department's statistics or witness testimony about the magnitude of her problem with clinical documentation. Further, she admitted her supervisors' concerns about her lack of documentation were warranted because it put her patients' health at risk and precluded her supervisors from accurately assessing her medical competence. While she maintained she was too busy to complete essential medical records in a timely manner, she admitted her supervisors had given her more administrative time than other doctors at MLK. There was also evidence that Alexander's patient load was the same or slightly less than that carried by other doctors at MLK and testimony from Bonman that she (Bonman) was able to keep up with her charting responsibilities even while participating in committee work that Alexander did not perform. That is all ample evidence justifying the ruling the trial court made; as we said at the outset, whether there is some evidence pointing in the contrary direction is immaterial.[1]

---

[1] It is unclear whether Alexander contends the trial court erred by not accepting her argument that it was "unfair" to ask her to reapply for privileges while on leave. Insofar as the contention is still being advanced, it fails. The trial court appropriately rejected the argument as belatedly raised and inadequately presented.

## DISPOSITION

The trial court's order denying Alexander's petition for writ of administrative mandamus is affirmed.  The Department is awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



HOFFSTADT, P. J.



KUMAR, J.[*]

---

[*]     Retired Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution